AGRICULTURAL INSURANCE COMPANY OF WATERTOWN, N. Y., A CORPORATION, APPELLANT, *v.* NORMAN BILTZ, RESPONDENT.

No. 3154

February 5, 1937. 64 P. (2d) 1042.

*L. D. Summerfield,* for Appellant:

*George Springmeyer* and *Douglas A. Busey,* for
Respondent:

## OPINION

By the Court, DUCKER, J.:

Plaintiff brought this action to recover the full amount of a policy for the destruction by fire of a building owned by him and known as the Club Crystal. At the time of the fire plaintiff held two other policies covering the building, one being issued by the Eagle Star & British Dominions Insurance Company Limited of London, England, for $3,500, and the other being issued by the Westchester Fire Insurance Company of New York, for $3,000, on which suits were also instituted. The policies contain the same provisions except as to amount. The suit against the London company was removed to the federal court.

The complaint in this case contains the usual allegations for recovery on a fire insurance policy. The answer admits the refusal to pay the full amount of

the policy, alleges the inability of the parties to agree on the amount of the loss, the submission of the controversy pursuant to policy provisions to two appraisers and an umpire, the award by one of the appraisers and the umpire, in the sum of $864, the offer and willingness of the company to pay the same, and the refusal of the insured to accept it.

The reply admits these allegations and prays that the award be set aside on certain equitable grounds, and that plaintiff have judgment against defendant for $2,000, the amount of the policy. Finding for plaintiff on all issues, the court set aside the award and entered judgment for him in the sum of $2,000 damages, with interest thereon at the legal rate from April 6, 1935, the date of the award.

The appeal is from the judgment and order denying defendant's motion for a new trial. We will continue to refer to the parties as they were in the court below.

Plaintiff and defendant's adjuster, having been unable to settle the loss, the parties had recourse to arbitration under the following provisions of the policy:

"In the event of a disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately the sound value and damage, and failing to agree shall submit their differences to the umpire; and the award of any two shall determine the amount of such loss."

Plaintiff appointed one George W. Lott as an appraiser, and defendant appointed one Frank Maloney. These appraisers, who were in fact arbitrators, selected one J. R. Wolert, as umpire. The award was made by Maloney and Wolert in the sum stated in the answer. Lott refused to join in it.

■ Defendant contends, first, that we should reverse

the judgment because the plaintiff, in the appointment of an appraiser, and throughout, sought an unfair and unconscionable advantage in the arbitration. Accordingly, it is argued that the court should apply the equitable maxim that he who comes into equity must come with clean hands, and leave the parties where they were found at the inception of the litigation. We need not determine this point because the record does not disclose that it was urged in the court below. It is well established in this jurisdiction by a long line of decisions that a point not urged in the lower court will not be considered on appeal. McLeod v. Lee, 17 Nev. 103, 28 P. 124; Studebaker Bros. Co. v. Witcher, 44 Nev. 468, 199 P. 477; Bralis v. Flanges, 45 Nev. 178, 199 P. 475; Paterson v. Condos, 55 Nev. 260, 30 P. (2d) 283.

A major objection to the judgment is that the evidence is not sufficient to justify the action of the court in setting aside the award. This contention has been elaborately argued with reference to all of the grounds on which the trial court set the award aside. The reply alleges, among other things, that plaintiff was denied the right to present evidence to the arbitrators and umpire. Included in the findings is one to that effect, and we are of the opinion that it is sustained by substantial evidence. It is, therefore, unnecessary to consider whether any of the other findings have such legal support. On the issue of reasonable opportunity to present evidence we feel that it would result in useless extension of this opinion to detail the evidence tending to support the finding made thereon, and will state it in substance only.

The first meeting of the arbitrators and umpire was held at Sacramento, Calif., in February 1935; a second meeting at the site of the Club Crystal at Lake Tahoe on April 3, 1935; and a third and final meeting at Truckee, Calif., April 6, 1935. At the first meeting, besides the arbitrators and umpire, Mr. George Springmeyer, Mr. W. N. Ball, and Mr. Joe King were present.

Mr. Springmeyer is an attorney for plaintiff, and Mr. Ball is the adjuster for the insurance company.

Mr. King was a witness for plaintiff. He was a former owner of the Club Crystal. In answer to a question by Springmeyer about the first meeting, he testified:

"Well, when we first met there we were all pretty friendly and started discussing the thing, and, as I remember, you told Mr. Ball and Mr. Maloney we wanted to do this right and legally, and you wanted to present certain evidence and certain witnesses before the board of arbitrators, and you expected to be present yourself and wanted Mr. Ball to be present each time, and Mr. Maloney told you you had nothing more to do with it and they would meet whenever they felt like it, and he would get all the evidence they wanted."

In reply to another question by Springmeyer, he testified: "* * * You seemed to have quite an argument as to who would be present at this meeting of the board. You insisted on being present, and also asked that Mr. Ball be present when any witnesses or any evidence was presented, and Mr. Maloney insisted they would have the meetings when they pleased, that you had nothing more to do with it, it was entirely before the board and he would get what evidence they needed."

King was present at the meeting at the site, and concerning the condition existing there testified: "The ground was covered with snow, I should say four or five inches; in fact, so much you couldn't determine the site. * * *" At this meeting he said Maloney said some hard things about him. Asked by Springmeyer if anything was said in the meeting about witnesses, King replied: "You said you had some further witnesses you wanted to bring in, you wanted to bring in some carpenters and someone else to testify as to the size of the building, the approximate cost, so forth, and Mr. Maloney said he didn't need any more witnesses; didn't need any more evidence. * * * You asked me about the cost of the building, or rather you asked Mr.

Maloney to consult me about the cost of the building. * * * He (Maloney) said he didn't trust me, he intimated I was quite a liar."

On cross-examination concerning his testimony at the Sacramento meeting this witness was asked: "Now, what information have you given here in Court today that you didn't give at the Sacramento meeting?" He replied, in substance, that he gave no information there as to the size of the building, and the materials put in; that Springmeyer asked him once about the size of the building and when he told him "Mr. Maloney jumped up and said that was wrong and didn't care to hear any more about it." The witness testified that that was about all the information he gave and that, as far as he knew, no one else gave any information at the Sacramento meeting.

George W. Lott was a witness for plaintiff at the trial. On this phase of the case he testified: "We went to the site of the building and it was agreed on in Sacramento we were to go there and recheck the size of this building, the structure. We found that ground in very bad condition. Although we did try to determine the length of the building from the road, it was hard to accomplish anything, and at that time Mr. Springmeyer suggested that Mr. King enlighten the thing by giving his idea of the dimensions and construction of the building. At that time Mr. Maloney said there wasn't any use of Mr. King saying anything, he wouldn't believe him on a stack of Bibles, and Mr. Ball made some remark carrying practically the same weight, but finally all of them stepped the building off and gave the different ideas from fifty to eighty feet. Mr. Springmeyer insisted * * * that all evidence should be listened to and more evidence should be given to determine the structure and size of the building. At that time I suggested we come back at another time when the ground could be seen and rechecked for the size. That was my idea when we left, that would be done."

Concerning the meeting in Truckee, Lott testified, in part: "Mr. Maloney said: 'Let's get the thing started.' I said: 'I didn't feel like getting started, I didn't think things were ready, and I said I didn't think any one in the bunch knew anything about it,' and I said 'I think Mr. Springmeyer should be present.' * * * I asked him (Maloney) several times—'I wanted more evidence and I wanted it right. * * .* I wanted to find somebody who had worked on the building and knew how the building was constructed. I had never seen the building, knew nothing about it.' * * * I said, 'There is no use going on, stop right now until we find out how big this building is; let's get Mr. Springmeyer and see if he knows somebody that can tell and if he can't we will have to guess at it.' "

George Springmeyer testified in substance as follows: Maloney resented his appearance at the Sacramento meeting, and said it was a matter for the arbitrators to decide in their own way and that no one else had any right to be present. "I will get my evidence by myself in any way I see fit and you or nobody else will know anything about it; I will work this thing out the way I wish," he said, "because I have done this before." The witness testified that he stated to the board: "I have made it clear to you by my letters, and I am going to stand upon the proposition, that every time you consider anything whatever I want to be present and hear what is said and know what is being done, and examine any sort of evidence you may have. I want also to have the opportunity of presenting my own evidence so that we can establish value just as value would be established in a court of law." According to this witness, when the meeting was held at the site of the building, there was from eight to ten inches of snow on the ground. There, he contended, Maloney assumed the same attitude of opposition to his right to present evidence. The latter had no witness there but King, whom he asked various questions about the building. Maloney said he would

not believe King under oath. "I don't want to listen to any evidence," he said, "I will get my own evidence in my own way." Springmeyer said: "I notify you again that when you fix a date which is convenient to every one I will have witnesses present who will testify to all the details and items concerning this building." "Mr. Lott or Mr. Wolert said," the witness stated, "We will come back here another time when the snow is off and will find out if we possibly can the size of the building."

Springmeyer testified further that on April 5, 1935, in Reno, Maloney called him on the telephone inquiring as to the whereabouts of Lott, and said in the course of the conversation that he wanted to get through with this. The witness testified that he said to Maloney, "Whenever you men consider any evidence, I have further evidence to offer, and you are not going to do anything unless I am present. Besides, there was no understanding as to the time and place when we left Crystal Bay except we were going back to Crystal Bay some time later and hear more evidence; you are not going to get through with it tomorrow because I am going to Stanford to see Mrs. Springmeyer and I am leaving on the nine o'clock train."

██ We need not state the testimony of defendant's witnesses on this point. It merely raises a conflict of evidence, which, under a long standing rule, must be resolved in favor of the finding of the trial court. The fact, if it is a fact, as defendant contends, that we are dealing with a common-law arbitration does not affect the rule of the finality of substantial evidence on disputed questions of fact. Nor does the language in Steel v. Steel, 1 Nev. 27, relied on by defendant, affect this rule. There the court was speaking of the determinative quality of an award as against mere errors of law or fact involved in a given case. As to these, an award has the character of conclusiveness. But we are dealing with an issue in which an arbitrator and umpire have allegedly acted beyond the scope of their authority,

namely, in depriving a party of the right to present evidence. In this situation equity intervenes and the finding of the lower court based on substantial evidence as to that issue may not be disturbed. The case of Firemen's Fund Ins. Co. v. Flint Hosiery Mills (C. C. A.), 74 F. (2d) 533, 104 A. L. R. 556, pressed upon us in support of defendant's position does not aid him because the rule is not the same. In the federal jurisdiction the appellate court is not bound by a decision of the lower court made on conflicting evidence, in a case in equity, but tries it de novo. In our jurisdiction the rule applies in equity as well as in an action at law. Costello v. Scott, 30 Nev. 43, 93 P. 1, 94 P. 222; Schmidt v. Horton, 52 Nev. 302, 287 P. 274.

6. Defendant's counsel seeks to bring the point within the scope of the exception recognized and applied in Smith v. Goodin, 46 Nev. 299, 206 P. 1067, and Valverde v. Valverde, 55 Nev. 82, 26 P. (2d) 233. To this end the credibility of the testimony of plaintiff's witnesses has been repeatedly assailed. As to this contention, we say that their testimony is not of the weak and inconclusive character deemed to be without legal weight in those cases. Again, defendant contends that the arbitrators and umpire were chosen as experts and, therefore, under a well-established rule, were entitled to make an award based on their technical knowledge of the subject-matter of the arbitration. In answer we say there is nothing in the agreement for arbitration to indicate that the matter was to be decided without the parties being heard and accorded the right to present evidence. Moreover, the character of the subject matter of the dispute, to wit, the total destruction of a building and fixtures by fire, forbids an inference that the arbitrators and umpire were chosen as experts to decide the matter from their own knowledge. As stated in Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 617, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084:

"The dispute concerned the thing which had been destroyed, the value of something which was not to be

inspected and valued from observation because it was not in existence. Evidence was therefore essential to show what had been destroyed as well as its value."

■ It is well settled that parties are entitled to be heard and present evidence before the arbitrators, and depriving a party of such substantial right is misconduct that will render the award invalid. Christenson v. Cudahy Packing Co., 198 Cal. 685, 247 P. 207; Modern System Bakery v. Salisbury, 215 Ky. 230, 284 S. W. 994; City of Auburn v. Paul, 113 Me. 207, 93 A. 289, Ann. Cas. 1917E, 136; Second Soc. of Universalists v. Royal Ins. Co., 221 Mass. 518, 109 N. E. 384, Ann. Cas. 1917E, 491; Day v. Hammond, 57 N. Y. 479, 15 Am. Rep. 522; Coons v. Coons, 95 Va. 434, 28 S. E. 885, 64 Am. St. Rep. 804; Dufresne v. Marine Ins. Co., 157 Minn. 390, 196 N. W. 560; Aetna Ins. Co. v. Hefferlin (C. C. A.), 260 F. 695; Halstead v. Seaman, 82 N. Y. 27, 37 Am. Rep. 536; 2 R. C. L. p. 378–9; 5 C. J. pp. 84, 93; 2 Am. Juris. p. 929; Morse on Arbitration and Awards, pp. 117, 536; Russell on Arbitration and Awards, pp. 171, 442, 443.

■ The defendant contends that there was never a sufficient offer of evidence on the part of plaintiff to afford an adequate basis for the finding that he was denied this right. We think the testimony which the trial court accepted as most credible was sufficient in this regard. True, Springmeyer did not state the names of the witnesses he proposed to produce, but it seems that the names of witnesses having first-hand information of the value of the building were not then known to him. However, he did state in a general way the character of the evidence he wished to adduce which was material to establish the value. The only witness he had at the meeting at the site was denounced by Maloney as unworthy of belief. His mind, according to King, Lott, and Springmeyer, was closed to the reception of any evidence which plaintiff could present, and closed from the beginning of the arbitration at Sacramento. He had an erroneous notion of the duties of an

arbitrator not acting in the capacity of an expert. The meeting at the site does not seem to have been productive of anything but dissension. It was not considered final and the circumstances were such as to induce Springmeyer to believe that there would be another meeting at which he would have the opportunity, at least, to offer evidence of the kind he indicated. He was not afforded such right, and this was fatal to the award.

We have given due consideration to the evidence as a whole and find that it adequately supports the judgment. This is so without regard to whether the escalator (outside elevator) and neon sign are covered by the policy. (Defendant insists they are not.) It appears from the record that the court did not take these into consideration in evaluating the damages suffered.

It is contended that the bar and back bar should not have been considered because they were trade fixtures and not covered by the policy. Plaintiff contends that they were permanent fixtures and insured with the building. We need not determine their character in this regard for their value was found to be $900, and the value of the building $9,500. Therefore if they had been left out of the account by the court in ascertaining the value of the latter there would still be a value in excess of $8,500, the total of the three insurance policies.

It is contended that the trial court erred in allowing interest on the judgment from April 6, 1935, instead of from date of judgment, March 5, 1936. We are also of this opinion. Section 4322 N. C. L., insofar as it is applicable, provides:

"When there is no express contract in writing fixing a different rate of interest, interest shall be allowed at the rate of seven per cent per annum upon all money from the time it becomes due, in the following cases:

"(a) Upon contracts, express or implied, other than book accounts."

The policy of insurance is a contract and contains the following stipulation:

"The loss shall not become payable until sixty days

after notice, ascertainment, estimate, and satisfactory proof of loss herein required have been received by this company, including an award by appraisers where appraisal has been required."

This stipulation provides methods for establishing the loss, in other words, for liquidating the claim and fixing a time thereafter for payment. But as there was no satisfactory proof of loss, or valid award, the demand was unliquidated until the rendition of judgment.

 The money did not become due under the statute until then. The statute is in harmony with the general rule that interest is not recoverable upon unliquidated demands, but is allowable only after such demands have been merged in a judgment. 33 C. J. 211. Our conclusion is sustained by the ruling in Stemmer v. Insurance Company, 33 Or. 65, 49 P. 588, 53 P. 498, 504. In that case the insured sued to set side the award of arbitrators. The award was upheld. On the question of plaintiff's claim for interest from the time of his loss, the court said:

"The suit is not prosecuted to recover the amount awarded, and the damage sustained by plaintiff, although ascertained by the appraisers, was unliquidated until the decree was rendered, for which reason there was no error in refusing to allow interest."

The statement quoted from 15 R. C. L. 26, and asserted as the law of this case, is not applicable. It regards interest allowed as damages when the amount of damages is more or less in the discretion of the court. Such is not this case. Here interest is allowable only by reason of the statute.

 The court denied defendant's motion to retax costs for mileage for five witnesses for thirty-two miles at 15 cents per mile from Reno, Washoe County, to Carson City, in Ormsby County, where the case was tried. The parties agree that the items of mileage are proper to be allowed as costs, and as their view is contrary to the decisions of this court, they have stipulated that we may determine the question.

They contend that said items are allowable as costs notwithstanding section 8978 N. C. L., which provides in part:

"No person shall be required to attend as a witness before any court, judge, justice, referee, or other officer, out of the county in which he resides, unless the distance be less than thirty miles from his place of residence to the county of trial."

We do not agree with counsel. This court has uniformly held that fees for mileage of witnesses cannot be taxed as costs when not subpenaed in the case according to law. Meagher v. Van Zandt, 18 Nev. 230, 2 P. 57; Zelavin v. Tonopah Belmont Dev. Co., 39 Nev. 1, 149 P. 188; Bream v. Nevada Motor Company, 51 Nev. 100, 269 P. 606; Warren v. De Long, 57 Nev. 131, 59 P. (2d) 1165.

The rulings in those cases turned on the construction given the words "required to attend" appearing in the statute in force when the decisions were made (Comp. Laws 1873, sec. 2742), which provides:

"Witnesses required to attend in any of the Courts of this State shall be entitled to the following fees [compensation]."

It was held that one was not required to attend as a witness save when a subpena was served upon him. The said witnesses in the instant case were not required to attend because of said section 8978.

Counsel concede the soundness of Zelavin v. Tonopah Belmont Dev. Co., supra, which was decided in 1915. But they refer us to section 8934 N. C. L., as amended by Stats. of 1919 at page 56, and say that in Bream v. Nevada Motors Company, supra, decided in 1928, we overlooked the change wrought by the amendment. They insist that the following part thereof was intended to change the rule of the former case:

"Issuance or service of subpena shall not be necessary to entitle a prevailing party to tax, as costs, witness fees and mileage, provided that such witnesses be sworn and testify in the cause." Stats. 1919, p. 56.

This amendatory statute was approved March 10, 1919. Whether the legislature of 1919 intended thereby to effect such change is of no consequence, for it is clear that a subsequent enactment by the same legislature approved March 26, 1919, is decisive of, the question against counsels' contention. The pertinent part of this statute reads:

"§ 1. Witnesses required to attend in the courts of this state shall receive the following compensation." Section 8490 N. C. L.

 We must presume that the legislature employed the words "witnesses required to attend" as they have been construed by this court. Being the later enactment, it is controlling under a well-settled principle of law.

We observe that the legislature of 1933 employed the same words in amending section 8490 N. C. L., Stats. 1933, p. 68, c. 60, sec. 1.

As the five witnesses in this case were not required to attend, their mileage should not have been allowed as costs.

The trial court is ordered to retax the costs in accordance with these views.

That part of the judgment allowing interest from April 6, 1935, is modified so as to allow interest at 7 percent per annum from the date of judgment.

As so modified, the judgment and order denying defendant's motion for a new trial are affirmed.